UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARMEN MANUKIAN,

                Plaintiff,

– against –

PROCIDA CONSTRUCTION CORP. NEW YORK,

                Defendant.

**OPINION & ORDER**

23 Civ. 10249 (ER)

RAMOS, D.J.:

      Armen Manukian ("Manukian"), proceeding *pro se*, brought this action against Procida Construction Corp. ("Procida"),[1] alleging claims of unpaid wages and discrimination. Doc. 2. Before the Court is Procida's motion for summary judgment dismissing all of Manukian's claims with prejudice. Doc. 23. For the reasons stated below, the motion is GRANTED.

## I. BACKGROUND[2]

### A. Factual Background

      Manukian was born in Armenia, is a citizen of Ukraine, and was raised in Ukraine and Russia. Doc. 25 ¶ 1. He emigrated to the United States on June 20, 2014, initially residing in California before moving to New York in December 2014. *Id.* ¶ 2. Manukian speaks some English, often relying on interpreters and translation software to communicate. *Id.* ¶¶ 8, 9. He rates his English reading and writing as a 3 or 4 out of 10, and he can speak some English conversationally. Doc. 24-5 at 9. Manukian states that he rates his communication with his "team" a 9 out of 10, and that his English abilities sufficiently allow him to communicate at work. Doc. 28 ¶¶ 7, 8.

---

[1] Procida states that Manukian incorrectly identifies it as "Procida Construction Corp. *New York*." Docs. 26 at 1, 30 at 1 (emphasis added).

[2] The following facts are drawn from Procida's notice of removal, Doc. 1, its Rule 56.1 statement, Doc. 25, Manukian's counterstatement to Procida's Rule 56.1 statement, Doc. 28, and the parties' supporting declarations, exhibits, and pleadings. The facts recited here are undisputed unless otherwise noted.

In June 2018, Manukian was hired by CW Metals, Inc. as an iron worker. Doc. 25 ¶ 11. He first worked at a jobsite known as "153 Sherman," where he was paid in cash. *Id.* ¶ 12; Doc. 24-5 at 74. A few weeks later, Manukian was sent to another jobsite referred to as "Tres Puentes."[3] Doc. 25 ¶ 12; Doc. 24-5 at 74. Manukian testified that, at Tres Puentes, he received an orientation led by an individual who he believed to be a Procida employee, based on his uniform. Doc. 24-5 at 72, 74–76. Procida states that the purported orientation would have been provided by CW Metals, not Procida. Doc. 25 ¶ 13. It states that, "[w]hile CW Metals may have been hired by [Procida] as a subcontractor to perform work on various construction projects, [Manukian] was not employed by [Procida] prior to August 2018." *Id.* ¶ 17. Manukian testified that the orientation at Tres Puentes was conducted in English, and that he did not have—or request—an interpreter or any other translating service. Doc. 24-5 at 77. However, he testified that although he did not speak English as fluently as the individual conducting the orientation, he understood what was being said. *Id.* When asked at his deposition whether it is possible that he misunderstood things that were said to him at the orientation, Manukian answered, "Possible, yes." *Id.* Manukian was then asked what he believes was said to him during the orientation; he answered:

> I was told that I will be receiving $65.25 as a city laborer. But before he said that, he asked are you a mechanic or a laborer. And I did not know the word laborer, and I had used a translating service for that specific word, laborer. And I had used the service of Google Translate to translate that word laborer. And I understood that I'm not a mechanic, that I was a laborer.

*Id.* at 78.

Following the orientation, Manukian worked at Tres Puentes—which Procida states was a prevailing wage jobsite[4]—where he was paid approximately $90 per hour.

---

[3] In his complaint, Manukian states that he was sent to this second jobsite, located at 271 E 138th Street in the Bronx, on June 23, 2018. Doc. 1-1 at ECF 5; *see also* Doc. 1-3 ¶ 12. He states he was then transferred back to 153 Sherman Ave, in Manhattan, on July 14, 2018. Doc. 1-1 at ECF 5.

[4] "Prevailing wages are the wages that prevail in a locality for a day's work in a particular trade or occupation." *Johnson v. Carlo Lizza & Sons Paving, Inc.*, 160 F. Supp. 3d 605, 608 n.1 (S.D.N.Y. 2016)

2

Doc. 25 ¶ 15; Doc. 24-5 at 79.  Manukian testified that he was paid appropriately for the whole time that he worked there.  Doc. 24-5 at 82.  As previously discussed, Procida states that Manukian was employed by CW Metals, not Procida, during this time, notwithstanding that CW Metals "may have been hired by [Procida] as a subcontractor."  Doc. 25 ¶ 17.  Manukian testified that, although CW Metals issued his checks, "CW [Metals] had a contact with Procida, and they worked together on the project" at Tres Puentes.  Doc. 24-5 at 73.  Moreover, Manukian testified that he worked with Procida employees at both 153 Sherman and Tres Puentes, and that everyone, including subcontractors "operated . . . as Procida employee[s]."  *Id.* at 75.  In any event, Manukian affirmed in his deposition that the orientation, at which he was allegedly told he would be paid $65.25, took place while he was still employed by CW Metals, and before he completed his onboarding paperwork for Procida.  *Id.* at 143.  He states in his complaint that he "signed" with Procida on August 17, 2018.  Doc. 1-1 at ECF 5.

Indeed, there is no dispute that Manukian was employed by Procida, as a laborer, from August 2018 to February 2019.  Doc. 25 ¶ 19; Doc. 26 at 4; *see also* Doc. 24-10 (pay stubs).  At the start of his employment with Procida, Manukian completed several onboarding documents, including tax forms, employment eligibility verification, and confidentiality agreements.  Doc. 25 ¶ 20.  While Manukian filled out those documents, he admits that he may not have fully understood what they meant.  *Id.* ¶ 21; Doc. 28 ¶¶ 20, 21.  Manukian also received and signed an Employee Resource & Information Guide acknowledgment on August 17, 2018, which stated that Manukian's employment with

---

(citing N.Y.L.L § 220(3)(a)).  "The prevailing rate is determined by the commissioner of labor or city comptroller."  *Hajny v. Best Roofing of New Jersey, Inc.*, No. 11 Civ. 00173, at *6 (LLS), 2011 WL 2493737 (S.D.N.Y June 22, 2011) (citing, inter alia, N.Y.L.L. § 220(5)).  New York laws require that workers on public works projects receive prevailing wages.  *Id.* (citing N.Y.L.L. §§ 220(3), 220(5)).  "The laws also require that contracts between a contractor and a public entity for public work provide that the contractor's workers will receive not less than the prevailing wage."  *Id.* (citing, inter alia, N.Y.L.L. § 220(3)).

Procida was "at-will" and could be terminated by either party with or without cause at any time. Doc. 25 ¶ 23; *see* Doc. 24-7 at ECF 9.

Procida states that it also provided Manukian with a Notice and Acknowledgment of Pay Rate and Payday (the "Notice"), which stated that Manukian would be paid $18 per hour as a Laborer. Doc. 25 ¶ 22; *see* Doc. 24-8. Manukian did not sign the Notice, *see* Doc. 24-8, and he states that he did not fill it out. Doc. 28 ¶¶ 22.[5] Manukian claims in his counterstatement to Procida's Rule 56.1 statement that he first saw the Notice in 2024, not 2018, and that, "from the very beginning," Procida hid it from him; he adds that he was "misled and secretly manipulated." Doc. 28 ¶¶ 12, 22, 23, 26. Manukian also states that he "would not have agreed" to work for $18 per hour, having understood from his orientation that he would be paid $65.25. *Id.* ¶¶ 12, 23. He testified that no one told him he would be paid $18 per hour for his work at Procida. Doc. 24-5 at 100. However, when asked at his deposition whether he took the job with Procida without knowing how much he would be paid, Manukian responded: "I knew that it would be 15, 18, 17. Minimum wage. But when I had passed orientation, I understood that I would have a substantially decent wage." *Id.* at 101.

Procida states that it never provided Manukian with any document stating that he would be paid at a rate of $65.25 per hour. Doc. 25 ¶ 25. Manukian conceded at his deposition that, after he received and signed his onboarding documents with Procida, no one at Procida ever promised to pay him $65.25 per hour, and no one at Procida ever gave him a job that paid $65.25 per hour. Doc. 24-5 at 145, 147. Manukian argues in his counterstatement to Procida's Rule 56.1 statement, however, that while he "was not promised 65.25 on these projects," Procida knows that he was told the $65.25 figure at

---

[5] The Notice contains two mutually exclusive options regarding language: (1) "I have been given this pay notice in English because it is my primary language"; and (2) "My primary language is _____. I have been given this pay notice in English only, because the Department of Labor does not yet offer a pay notice form in my primary language." Doc. 24-8. However, in the Notice, in which Manukian's signature line is blank, both boxes are checked off, and "English" is handwritten into the blank. *Id.*

his orientation. Doc. 28 ¶ 40. Manukian also states in his counterstatement to Procida's Rule 56.1 statement that he was "promised . . . to earn more in the future . . . [after] passing the probationary period, [OSHA] training, [and] Microsoft courses during the Gilbert Project"—another Procida construction job discussed further below. Doc. 28 ¶ 24.

In his testimony and memoranda of law, Manukian provides various additional rationales for why he is claiming damages based on an hourly wage of $65.25. He testified that, while working at various Procida sites, he "had no understanding" as to who would pay him and how much, continuing:

> This is why I had focused on that specific amount of $65 to kind of force myself and motivate myself, because this was a physically straining job. Working among other colleagues and people, it was psychologically pressure. It was not always about the money. It was also . . . the thought of the future. And I did not -- I did not start speaking about this specific amount of $65 after the orientation, but I focused on working in the company.

Doc. 24-5 at 102. Yet in his counterstatement to Procida's Rule 56.1 statement, Manukian emphasizes that, in his construction work, he was motivated not by the $65.25 hourly rate of pay, but rather by his goal of achieving recognition and respect in the construction business. Doc. 28 ¶ 26. Manukian also testified that he was put to work "as if [he] was getting paid 65.25," and so he "focused on that specific sum to cover the damage . . . and loss of wages" he has purportedly suffered. Doc. 24-5 at 120–21. In his counterstatement to Procida's Rule 56.1 statement, he adds that "the claim for 65.25 is purely for damages" and because he believes that "there was no desire to work with him because of this origin . . . because he is of Armenian descent[.]" Doc. 28 ¶ 39.

Procida provides that Manukian worked on six jobsites during his employment, some for stints as short as a single day or a few weeks: (1) 2035 Newbold in Westchester, New York; (2) 2044 Westchester Avenue; (3) 105 South 5th Street; (4) 1912 1st Avenue, also known as "the Gilbert"; (5) 143 West 108th Street; and (6) 917

5

Westchester Avenue, also known as "TLK." Doc. 25 ¶ 27. Manukian testified that, at 2035 Newbold and TLK, he was paid $18 per hour for his work, and at the time, he believed that was the correct wage. Doc. 24-5 at 110, 121–23. Regarding 2044 Westchester Avenue, where he worked for two to three weeks, he also testified that he earned $18 per hour and that he was never told that he would earn anything more than that. *Id.* at 112, 113. Nonetheless, Manukian testified that, while at 2044 Westchester Avenue, he discussed his wages—including that he did not get paid $65.25 per hour—with an individual named Joseph. *Id.* at 114. Manukian testified that he did not recall working at either of 105 South 5th Street or 143 West 108th Street. *Id.* at 115, 121.

As for the Gilbert, Manukian testified that he worked there from September of 2018 to February 10, 2019, and that he was again paid $18. *Id.* at 115–116, 117. He testified that no one ever told him that he would be paid more than $18 for his work there; however, when asked at his deposition whether he believed he was paid appropriately during his work at the Gilbert, Manukian responded: "As an employee of the company, I think that I did not receive appropriate amount. I think I . . . had been owed more, because it was a . . . public job on the street." *Id.* at 118.

Manukian states in his complaint that he was told the Gilbert Project was a city project, Doc. 1-1 at ECF 6, and he additionally testified at his deposition that he believed it was a city project because everyone "acted like it was a public city project," and "different workers, city workers, different companies worked on that site." Doc. 24-5 at 118, 119. Manukian also claims, in his counterstatement to Procida's Rule 56.1 statement, that there was a fence in front of the Gilbert that indicated that the New York City Housing Corporation and City of New York were "building the project." Doc. 28 ¶ 32. However, Manukian also conceded at his deposition that he was not told that his job at the Gilbert was a prevailing wage job, nor did he believe that it was—notwithstanding that he had testified that he believed it was a "city project" and thus a "public job." *Id.* at 120. Manukian continued: "I didn't really care which job it was. I had submitted the

6

complaint about $65.25 per hour, because I was fired without any reason from my job . . . That was the only reason I submitted a complaint. It was not because I was hunting specifically after that amount of $65.25." *Id.*

Procida contends that the work at the Gilbert—a private apartment building—was not subject to a public works contract, and that it was thus not covered by prevailing wage laws. Doc. 24-4 ¶¶ 4, 5. Rather, the Gilbert Project was governed by a contract between private parties, with no involvement by governmental agencies. *Id.* ¶ 6; *see also id.* Exhibit A (contract between owner and contractor for the Gilbert) at ECF 5–6, 88. Therefore, Procida states that none of its employees, including Manukian, were ever paid prevailing wages for work performed on the Gilbert site. *Id.* ¶¶ 4, 7. In his affidavit, CEO of Procida Mario Procida states: "Based on my personal knowledge and my review of records maintained by Procida Construction[,] [Manukian] *never* worked for Procida Construction on a prevailing wage project. [Manukian] therefore could not have been owed any prevailing wages by Procida Construction." *Id.* ¶ 8.

Manukian received and reviewed all of his wage statements, *see* Doc. 24-10, and at his deposition, he testified that he believed all the information on his paychecks and paystubs was accurate. Doc. 24-5 at 126.

In February 2019, Manukian worked at Procida for the last time. Doc. 25 ¶ 42; Doc. 24-5 at 128. Manukian states that, on February 10, he had completed his day's work at the Gilbert as instructed, and he was "awaiting and seeking calls" informing him of his next jobsite or letting him know to return to the Gilbert the next day. Doc. 28 ¶ 42. Manukian testified that he typically texted with his co-workers in English about the next jobsite where he would work; however, after February 10, no one told him where to report to. Doc. 25 ¶ 43; *see* Doc. 24-5 at 128–29.[6] Manukian states that his employers

---

[6] The screenshots of texts submitted on the record show that on February 9, 2019, Manukian texted an individual identified in his cellphone as "Edde" to ask where he could report to for work; Edde responded the next day: "Good morning Armen. Currently I don't have anywhere to place you. I will give you a call when I need a person on a job." Doc. 29 at ECF 27. Manukian additionally texted an individual named Victor to request work, on February 11, 2019, and Victor replied that "Eddie" was "working on it trying to

knew that he needed work, and that there was still work needed at the Gilbert. Doc. 28 ¶ 43. He claims that he had been told since January of 2019 that he needed to work at the Gilbert for the time being, but that there would also be other projects, many of them offering "high pay." Doc. 22 at ECF 2. He states that in February of 2019, he was unexpectedly deprived of the opportunity to continue working on the project; he "saw that everyone was working on the Gilbert project" but he was "left outside," which felt unfair and not right. *Id.* at ECF 2, 4. Manukian states that his peers at the Gilbert Project viewed him as a hard worker, as someone who knew "the job and the position," and as a person who "want[ed] to work together, learn, and . . . did not think of leaving." *Id.* at ECF 3. He states he planned to continue working on construction projects with Procida, yet he believes he was "deliberately . . . deprived of the opportunity to work so that [he] could not earn money in the city and be independent[.]" *Id.*

Although Manukian asserts claims of discrimination based on his national origin, when asked at his deposition whether anyone at Procida ever expressed animus toward him because of his immigration status, he responded "[n]o animosity, no." Doc. 24-5 at 107. Manukian also responded in the negative when asked whether anyone made comments about his national origin, and whether he had any witnesses to support his discrimination claims. *Id.* ¶¶ 135, 141. Manukian states in his counterstatement to Procida's Rule 56.1 statement that, while "[n]o one made any direct comments to [him] about his background, . . . people constantly asked where he was from." Doc. 28 ¶ 45. When asked at his deposition if he had any documents to show or support his discrimination claim, Manukian responded that he exchanged some text messages with a Russian-speaking attorney that he believed worked at a law firm that specializes in

---

find a spot for [Manukian]." *Id.* at ECF 28. Manukian also texted an individual named Jon, on February 20, 2019, requesting work; John responded that Manukian should call Eddie, who had tried contacting Manukian, however Manukian replied that he tried reaching Eddie to no avail. *Id.* at ECF 26. Manukian claims that it is clear from this correspondence that he was still "on the Gilbert project on February 21," but that no one responded to his outreach. Doc. 22 at ECF 2.

8

workers' rights. Doc. 24-5 at 135–36.[7] Manukian states that he also texted his concerns about discrimination to Joseph. Doc. 28 ¶¶ 48, 49. The record contains a screenshot of texts that Manukian exchanged with a Joseph R. Figueroe on February 10, 2019, in which Manukian expressed that Procida was not paying him the amount he deserved, and that he was misunderstood and treated improperly because of his nationality, and because he is not American. Doc. 29 at ECF 23.

Manukian testified at his deposition that when Procida hired him, Procida knew that he was not born in the United States. Doc. 24-5 at 139. He was then asked: "If they wanted to discriminate against you because you were not born in America, then why do you think they would hire you in the first place?" *Id.* at 139–40. Manukian responded: "[I]t was not the discrimination based on my origin. It is discrimination about my employment, my career, future, because I was hired to work for the corporation." *Id.* at 140. In his counterstatement to Procida's Rule 56.1 statement, however, Manukian states that he was discriminated against based on his national origin, age, and "practical experience." Doc. 28 ¶¶ 47, 48.

After his employment at Procida ended in February of 2019, Manukian was out of work for approximately ten days. Doc. 25 ¶ 50. Thereafter, he began working for a publishing company called Publishers Circulation Fulfillment, Inc. (PCF). Doc. 24-5 at 25, 147. After his employment with PCF, Manukian testified that he registered with a union, through which he obtained employment as a cleaner at Pritchard Industries ("Pritchard"). Doc. 24-5 at 35. Manukian testified that Pritchard fired him after three months without reason. *Id.* at 38.

Manukian testified that, on the same date that he filed the instant lawsuit against Procida, he also sued PCF and Pritchard, respectively. Doc. 25 ¶ 52; Doc. 24-5 at 43–44.

---

[7] There is no evidence of this correspondence on the record. While the record contains text messages that Manukian exchanged with the Law Office of Brandon J. Broderick, Manukian testified that that correspondence came after his texts with the "Russian-speaking attorney." Doc. 24-5 at 136.

9

Manukian seeks $50,634 against PCF, which he calculated based on the claim that he should have been paid $65.25 per hour for a period of March 3 to September 15, 2019. Doc. 24-12 at ECF 4; Doc. 24-5 at 32.  He seeks $35,565 against Pritchard, calculated by multiplying $65.25 times approximately 550 hours allegedly worked between June 5 and September 10, 2024.  Doc. 24-11 at ECF 4; Doc. 24-5 at 43–44.

### B. Procedural History

On November 4, 2022, Manukian filed a complaint against Procida in state court, alleging that between July 14, 2019 and February 10, 2019, Procida did not pay him $65.25 per hour as he had been told at orientation, and that he was discriminated against. Doc. 1-1 at ECF 6.[8]  Manukian claims that, as a result of being underpaid, he was unable to pay for rent or for his "professional immigration process," and he was ultimately left without a home, without money, and without the ability to pay for food, which negatively impacted his health.  Doc. 1-1 at ECF 6.

Procida answered the complaint in state court on March 15, 2023.  Doc. 24-2.  On October 13, 2023, it served a demand for a Bill of Particulars ("BOP") on Manukian and, on October 24, 2023, Manukian provided Procida with his BOP.  Doc. 1-2, 1-3.  On November 21, 2023, Procida removed the case to this District pursuant to 28 U.S.C. §§ 1331, 1441, on grounds that, based on Manukian's BOP, Manukian was asserting federal discrimination claims.  *See* Doc. 1 ¶¶ 18–20.[9]

---

[8] In its notice of removal, Procida stated:  "To the limited extent comprehensible, the Summons and Complaint appear to seek redress against Procida Construction for a litany of purported violations during Plaintiff's alleged employment, including a claimed underpayment of promised prevailing wages and so-called 'discrimination.'"  Doc. 1 ¶ 12.

[9] Specifically, Procida's demand for a BOP directed Manukian to "[s]pecify with particularity any claims Plaintiff is asserting in this action under federal law, and the legal and factual bases for same."  *See* Doc. 1 ¶ 18 (quoting Doc. 1-2 ¶ 21).  In his BOP, Manukian referenced the Immigration and Nationality Act ("INA") and Title VII of the Civil Rights Act of 1964 ("Title VII"), and he appeared to reference the New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL"). *See* Doc. 1-3 ¶ 21–23.

On January 9, 2024, Manukian filed a statement supplementing his allegations.[10] Doc. 7. On August 13, 2024, Manukian was deposed with the assistance of a Russian interpreter. *See* Doc. 24-5 at 1, 2.

On December 9, 2024, Procida moved for summary judgment to dismiss all of Manukian's claims with prejudice. Doc. 23. Manukian filed an opposition and counterstatement to Procida's Rule 56.1 statement on January 10, 2025. Docs. 28, 29. Procida filed a reply on February 6, 2025. Doc. 30. On February 13, 2025, Manukian filed a supplemental response, also enclosing additional evidence. Doc. 31.[11]

## II.  LEGAL STANDARD

### A. Motion for Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free School District*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Id.* (citing *SCR Joint Venture*, 559 F.3d at 137). The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary

---

[10] Manukian states that the submission is an "answer" to Procida's "last arguments," however it is unclear whether he is responding to Procida's notice of removal or to a different submission. Doc. 7 at 1.

[11] On February 18, 2025, Manukian filed a letter attaching a clinical assessment report provided by the New York City Human Resources Administration Department of Social Services, as well as copies of certain papers from his litigation against PCF. Doc. 32. It is not readily apparent to the Court how these records are relevant to the instant motion. For example, the medical records corroborate that he has limited finances due to a lack of income, has OSHA certifications, and speaks English and Russian. Doc. 32 at ECF 14; *see also id.* at 17–18. The records also note that Manukian reported swelling and pain in his left knee. *Id.* However, the records do not shed additional light on any material facts or issues in this case.

11

judgment." *Saenger v. Montefiore Medical Center*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture, or surmise. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986)).

### B. Pro Se Plaintiff

"A *pro se* litigant's papers must be construed liberally 'to raise the strongest arguments they suggest.'" *Jules v. Andre Balazs Properties*, No. 20 Civ. 10500 (LGS), 2023 WL 5935626, at *2 (S.D.N.Y. Sept. 12, 2023) (quoting *Publicola v. Lomenzo*, 54 F.4th 108, 111 (2d Cir. 2022)). The obligation to be lenient while reading a *pro se* plaintiff's pleadings "applies with particular force when the plaintiff's civil rights are at issue." *Jackson v. New York State Department of Labor*, 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010) (citing *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004)). At the same time, "*pro se* status 'does not exempt a party from compliance with relevant rules of procedural and substantive law.'" *Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) (citation omitted). "[E]ven a *pro se* plaintiff cannot defeat a motion for summary judgment by relying merely on the allegations of a complaint." *Wali v. One Source Co.*, 678 F. Supp. 2d 170, 177 (S.D.N.Y. 2009) (citing *Champion v. Artuz*, 76 F.3d 483, 485 (2d Cir. 1996)). "Rather, when confronted with evidence of facts

12

that would support summary judgment, the plaintiff must come forward with evidence in admissible form that is capable of refuting those facts." *Id.* (citations omitted).

### III. DISCUSSION

#### A. Underpayment of Wages

Manukian alleges that Procida underpaid him by compensating him at an hourly rate of $18 instead of $65.25. However, Manukian fails to establish that Procida was required by contract, law, or otherwise, to pay him more than $18 per hour.

Manukian's primary argument is that he was told at an orientation that he would be paid $65.25 per hour as a "city laborer." Doc. 24-5 at 78. However, Manukian was employed by CW Metals, not Procida, during the purported orientation—which took place when he first started working at Tres Puentes in June 2018, where CW Metals in fact paid him $90 per hour. Manukian testified that he believed the orientation was conducted by a Procida employee, and that workers at Tres Puentes were—or "operated" as—Procida employees. Doc. 24-5 at 75. Manukian conceded at his deposition, however, that his employer at the time was CW Metals, and he does not provide any evidence tending to show that he was nonetheless promised, at that orientation, that he would be paid $65.25 per hour for Procida projects.

As for his employment at Procida, which began in August of 2018, Manukian conceded in his deposition that he was never promised $65.25 per hour for his work on Procida projects. He also fails to present any evidence to rebut Procida's claim that it never provided Manukian with any document stating that he would be paid at a rate of $65.25 per hour. Doc. 25 ¶ 25. Although Manukian claims that he did not receive the Notice stating that he would be paid $18 per hour, and that he would not have consented to those wages, he does not point to any evidence that he was ever told he would be paid

more than $18 per hour for Procida projects,[12] nor that he was otherwise contractually entitled to a higher hourly wage.

With regards to his work on the Gilbert Project, Manukian testified that he believed it was a "city project," and therefore he was entitled to higher wages because it was "public job." Doc. 24-5 at 118–119. Procida construes this as a claim that the Gilbert Project was a prevailing wage job, which it denies. *See* Doc. 1 ¶ 12, Doc. 26 at 11. The record before the Court establishes that the construction contract for the Gilbert was between only private parties, Doc. 24-4 Exhibit A, and Procida CEO Mario Procida attests that it "was not subject to a public works contract, and thus not subject to prevailing wage laws at all." Doc. 24-4 ¶ 5. Therefore, Procida states that none of its employees, including Manukian, were ever paid prevailing wages for their work at the Gilbert. Doc. 25 ¶ 35. Manukian also conceded at his deposition—despite his earlier testimony—that he was not told that his job at the Gilbert was a prevailing wage job, nor did he believe that it was. Doc. 24-5 at 121. Nor does Manukian set forth any evidence to establish that the Gilbert Project was subject to any public requirements affecting his wages—notwithstanding his belief that it was a public job. Therefore, there is no genuine dispute of material fact that Manukian was not statutorily entitled to a prevailing wage.

In sum, based on the record, no reasonable jury could find that Manukian was entitled to higher hourly wages than $18 as a Procida employee.

## B. Discrimination

Manukian makes a single mention of "discrimination" in his complaint,[13] but in his BOP, he references the following discrimination statutes: the INA, Title VII, NYSHRL, and NYCHRL. Doc. 1-3 ¶¶ 21–23. Construing Manukian's pleadings

---

[12] In his opposition, Manukian states that he was promised he would earn more in the future "after . . . passing the probationary period, [OSHA] training, [and] Microsoft courses during the Gilbert Project." Doc. 28 ¶ 24. However, this claim is not supported by any evidence in the record.

[13] He argues that, from July 14, 2018 to February 10, 2019, Procida discriminated against him by failing to pay him $65.25 per hour for New York City projects, contrary to what he was told at orientation. Doc. 24-1 at 5.

14

liberally, he appears to assert claims of discrimination based on his citizenship or immigration status, as well as on his national origin. *Id.* In his opposition papers to Procida's motion for summary judgment, Manukian adds that he was discriminated against based on his age. Doc. 28 ¶ 47. The Court finds that Manukian has failed to make a showing of discrimination under any of the aforementioned statutes.

The INA prohibits discrimination with respect to the hiring and firing of employees, based on their national origin or citizenship status. 8 U.S.C.A. § 1324(b)(a). To assert an INA discrimination claim in federal court, plaintiffs must first file a claim with the Office of Special Counsel for Immigration-Related Unfair Employment Practices. *See id.* § 1324(b)(d)(2); *see also* § 1324(b)(c)(1).

Title VII, the NYSHRL, and the NYCHRL also prohibit discrimination based on one's national origin. *See Pacheco v. Comprehensive Pharmacy Services*, No. 12 Civ. 1606 (AJN), 2013 WL 6087382, at *8 (S.D.N.Y. Nov. 19, 2013). A plaintiff bringing suit under Title VII must first exhaust his administrative remedies by filing a complaint with the Equal Employment Opportunity Commission within 300 days after the alleged unlawful employment act occurred. 42 U.S.C. § 2000e-5(e)(1). Discrimination claims under Title VII, the NYSHRL, and the NYCHRL are analyzed under the three-step burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010). Under this test, a plaintiff must first demonstrate a *prima facie* case of discrimination, which requires a showing of some admissible evidence of circumstances that would be sufficient to infer a discriminatory motive. *Tatas v. Ali Baba's Terrace, Inc.*, No. 19 Civ. 10595 (ER), 2022 WL 18027620, at *4 (S.D.N.Y. Dec. 30, 2022) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802).

As an initial matter, Manukian has not presented any evidence showing that he fulfilled the administrative requirements of the INA nor the exhaustion requirement for Title VII claims. *See Karupaiyan v. CVS Health Corp.*, No. 19 Civ. 8814 (KPF), 2021

15

WL 4341132, at *21 n.24 (S.D.N.Y. Sept. 23, 2021) (finding a failure to comply with the INA's administrative requirement fatal to the plaintiff's claims); *see also Zaltz v. Wells Fargo Home Mortgage*, 529 F. App'x 95, 96 (2d Cir. 2013) (summary order) ("Even assuming that [the *pro se* plaintiff] intended to file a Title VII claim . . . this claim cannot proceed because [she] did not file a timely complaint with the EEOC."). Moreover, Manukian cannot claim discrimination on the basis of his age, having raised that argument for the first time in his opposition to the instant motion for summary judgment. *See Wright v. Jewish Child Care Association of N.Y.*, 68 F. Supp. 3d 520, 529 (S.D.N.Y. 2014) (providing that "[i]t is black letter law that a party may not raise new claims for the first time in opposition to summary judgment," and holding that a *pro se* litigant's claims were untimely on that basis) (citation omitted)).

Even putting aside these procedural and jurisdictional defects, however, all of Manukian's discrimination claims fail on the merits. Manukian expresses in general terms that he felt he was treated differently because of his Armenian identity, or because he is not American. However, he does not point to a single particular example of being treated differently on account of his nationality, citizenship, or age, or of anyone at Procida expressing hostility towards him. In fact, Manukian stated at his deposition that Procida knew he was not born in the United States upon hiring him, and when asked why Procida would have hired him if they wanted to discriminate against him, he responded, "[I]t was not the discrimination based on my origin." Doc. 24-5 at 140. Further, Manukian expressly stated at his deposition that no one at Procida ever expressed animus towards him because of his immigration status, and he states in his counterstatement to Procida's Rule 56.1 statement that no one made any direct comments to him about his background.

Manukian also admitted at his deposition that he does not have any witnesses to support his discrimination claims. When asked if he had any documentary evidence of the alleged discrimination, Manukian pointed only to a text exchange with his colleague

16

Joseph, in which Manukian expressed his own perception that he was being treated improperly due to his nationality. Finally, Manukian's claim that "people constantly asked where he was from," without more, is not probative of discriminatory animus. Doc. 28 ¶ 45.

In sum, Manukian does not provide any evidence to corroborate his subjective, vague allegations that he was discriminated against. He relies merely on "unsupported assertions," which are insufficient as a matter of law to overcome Procida's motion for summary judgment. *Goenaga*, 51 F.3d at 18; *see also Nguedi v. Federal Reserve Bank of New York*, 813 F. App'x. 616, 617–18 (2d Cir. 2020) (finding that "[a] party cannot defeat a motion for summary judgment with mere speculation and conclusory assertions," and the plaintiff's "*pro se* status did not eliminate his obligation to support his claims with some evidence to survive summary judgment").

## IV. CONCLUSION

For the reasons set forth above, Procida's motion is GRANTED.

The Clerk of Court is respectfully directed to terminate the motion, Doc. 23, and to close the case.

It is SO ORDERED.

Dated:  September 5, 2025
        New York, New York

                                             _____
                                             EDGARDO RAMOS, U.S.D.J.